# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMUEL SHANKS,<br>        Plaintiff,<br><br>        v.<br><br>INTERNATIONAL UNION OF<br>BRICKLAYERS AND ALLIED<br>CRAFTWORKERS,<br>        Defendant. | Civil Action No. 23-311 (CKK) |

## MEMORANDUM OPINION
(September 22, 2023)

Plaintiff Samuel Shanks, proceeding *pro se*, brought an action in the Superior Court of the District of Columbia against Defendant International Union of Bricklayers and Allied Craftworkers ("BAC" or "Defendant"), alleging that Defendant violated the District of Columbia Human Rights Act, the Americans with Disabilities Act of 1990, Title VII of the Civil Rights Act of 1964, and "other applicable Civil Rights Acts." *See generally* Compl.  Defendant removed this action from D.C. Superior Court to federal court based on federal question jurisdiction.  Now pending before the Court is Defendant's [8] Motion to Dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  Upon consideration of the briefing,[1] the relevant legal authorities, and the record as a whole, the Court shall **GRANT** Defendant's Motion to Dismiss.

## I. BACKGROUND

---

[1] The Court's consideration has focused on the following documents:
- Plaintiff's Complaint, ECF No. 1-1 ("Compl.");
- Defendant's Motion to Dismiss, ECF No. 8 ("Def.'s Mot.");
- Plaintiff's Opposition to Motion to Dismiss, ECF No. 19 ("Pl.'s Opp'n");
- Defendant's Reply Brief to Support Motion to Dismiss, ECF No. 20 ("Def.'s Reply").

In an exercise of its discretion, the Court finds that holding oral 13 in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

Plaintiff Samuel Shanks identifies as a "gay Black American man." Compl. at 1. He worked for Defendant BAC, which is an international labor union, in the accounting department for over twenty years until his termination in October 2021. *Id.* Plaintiff alleges that during his tenure at BAC, he "experienced bouts of harassment, retaliation, targeting, systemic discrimination, excessive discipline, pay disparity, denied promotional opportunities, vilification and bullying by upper management based on my race, color, and sexual orientation." *Id.*

Plaintiff alleges that from 2007 to 2013, he faced harassment from BAC's then-Executive Director of Financial Management, Jennifer Penoso, "in the form of changing job duties, over-policing plaintiff, arbitrarily applying policies to him and not to other employees after Plaintiff spoke up about the mistreatment of staff and pay disparity." Pl.'s Opp'n at 4. In 2007, Plaintiff complained to Ms. Penoso about various pay disparities. *Id.* Plaintiff alleges that at the time, the three accountants in his department were non-white (two, himself included, were Black; one was Asian), and the two financial analysts were both white, one of whom made $20,000 more than the accountants. *Id.* The Director of Finance allegedly told Plaintiff that it wasn't "the right time" to pursue these issues; she also restricted Plaintiff's ability to work overtime hours. *Id.* Afterwards, the Director allegedly targeted, retaliated, and harassed the Plaintiff. *Id.* at 4–5. After Plaintiff told Ms. Penoso that he felt targeted because he was Black and gay, the Director's behavior "toned down." *Id.* at 5. Plaintiff claims that this direct harassment ceased around 2013. *Id.* Ms. Penoso was fired in 2018 and Plaintiff's concerns were never addressed.

Plaintiff claims that the allegedly discriminatory treatment began again in 2017 and increased during the time period of 2017 and 2021, creating a hostile work environment. Compl. at 1. In 2017, Plaintiff participated in contract negotiations for the bargaining unit of which he was a part, negotiating the most successful contract to date. Pl.'s Opp'n at 5; Def.'s Reply at 2

(explaining Plaintiff's role in the bargaining unit).  He alleges that after the negotiations, he was "celebrated by the Bargaining Unit and vilified by Management for working relentlessly to bring a level of equality in terms of Leave."  Pl.'s Opp'n at 5.  Plaintiff says that this led to "an onslaught of direct and indirect attacks from Management," including General Counsel Bridge O'Connor and Executive Financial Management Director Candice Dubberly.  *Id.*  The two white members of the bargaining unit's negotiation team were given merit increases or promotions, while Plaintiff and the other Black member[2] of the team were harassed and eventually terminated.  *Id.*

Later that year in September or October, after a white temporary employee entered the building on weekends and conducted fraudulent activities, BAC initiated a new building access policy ("Building Policy").  *Id.*  Bargaining unit employees' building access was cut off at 6:00 pm.  *Id.*  Plaintiff states that seventy percent of the bargaining unit is Black.  *Id.*  Accordingly, Plaintiff alleges, this Building Policy caused seventy percent of Black BAC employees to have restricted access, while eighty-five percent of white BAC employees had unrestricted building access.  *Id.*

In 2018, at a mandatory Anti-Discrimination/Anti-Harassment Training, Plaintiff was the only person to ask a question related to racism or discrimination during the Q&A segment.  *Id.* at 6.  When Plaintiff raised his hand, the training leader sighed and responded "of course," which, Plaintiff alleges, was "because he was known… to be outspoken on racial inequities."  *Id.*  The training leader then "danced around [his] question and never provided a valid response."  *Id.*

In February 2018, Plaintiff submitted an anonymous suggestion to the BAC's staff survey

---

[2] This other individual is Monetta Moseley, who has also sued BAC alleging similar claims.  *See* Case No. 1:23-cv-02109-CKK.

3

detailing the treatment of minority employees.  *Id.*  Plaintiff alleges that when former BAC

President James Boland and former Human Resources Director Robin Donovick reviewed the

responses, they knew which one was written by Plaintiff.  *Id.*

      Plaintiff then alleges that between 2013 and 2019, he had multiple direct conversations

with Ms. Donovick "about the disparate treatment/impact that was happening to Black

employees in areas of building access, transportation, leave, life insurance, etc. along with… pay

disparity." *Id.*  Ms. Donovick allegedly "tried to address what she could but felt helpless since

she was also suffering from extreme bullying by… Ms. O'Connor and feared retaliation." *Id.* at

6–7.  Ms. Donovick resigned in December 2020. *Id.* at 7.

      Between 2010 and 2021, Plaintiff utilized the Employee Assistance Program counseling

services from Dr. Karen Grear and told her about the harassment he was facing.  *Id.*  Dr. Grear

provided Plaintiff with support and offered to accompany him to any Human Resources

meetings. *Id.*

      In 2018 and 2019, Plaintiff had conversations with Mr. Boland and former Secretary

Treasurer Timothy Driscoll about the Building Policy, as well as concerns about pay disparity

and transit benefits.  *Id.*  Plaintiff claims that at the time, Mr. Boland and Mr. Driscoll "seemed

open to changing the culture of the organization even though their attempts were routinely

discouraged by the General Counsel [Ms. O'Connor] and the Executive Director of

Management." *Id.*

      In the beginning of 2019, Plaintiff and the other two accountants on his team reached out

to Ms. Donovick about the pay disparity of their positions in comparison to the financial

analysts.  *Id.*  At this time, the two financial analysts were both Asian, and there were two Black

accountants (including Plaintiff) and one Asian accountant.  *Id.* at 8.  The financial analysts were

making over $10,000 more than the accountants.  *Id.* Ms. Donovick took the accountants'

concerns to the new Director of Finance.  *Id.*  On June 25, 2019, the three accountants, including

Plaintiff, met with Executive Financial Management Director Candice Dubberly and Accounting

Director Sally Sohn.  *Id.* at 7.  During the meeting, Plaintiff alleges, Ms. Dubberly "became very

condescending, defensive and aggressive" and acted in a "nasty manner."  *Id.*  After this meeting,

Plaintiff alleges that he was targeted, retaliated against, and harassed.  *Id.* at 8.  Plaintiff notes

that as of the last day of his employment on October 12, 2021, the pay disparity still existed;

additionally, three accountant positions have been filed by Black individuals, and the two

financial analyst positions filled by Asian individuals.  *Id.*

     Also in 2019, Plaintiff organized, circulated, and signed the BAC Employee's Parking

Petition to encourage BAC to allow employees to use their transportation subsidy toward parking

in the parking garage to create more safe options for travel.  *Id.* at 8.  Plaintiff alleges that only

executives, directors, and managers—all of whom were white—had parking.  *Id.*  The BAC's

Executive Board, to whom the petition was presented, did not respond.  *Id.*  Later in December

2019, BAC allegedly misrepresented this petition to the bargaining unit's local representative.

*Id.*  On January 29, 2020, Plaintiff sent a response letter to BAC questioning why they would

make this misrepresentation.  *Id.* at 9.

     Plaintiff alleges that the retirement of BAC President Boland in December 2019 "ushered

in toxic changes to the environment."  *Id.* at 8.

     Ms. Dubberly claimed to have seen Plaintiff access the building outside of regular

business hours, *id.* at 9; Def.'s Reply at 3, and on January 30, 2020, BAC wrote him up for

violating a "nonexistent BAC ID Badge Policy," Pl.'s Opp'n at 9.  Plaintiff submitted a

grievance, and at the grievance meeting, Plaintiff informed the Human Resources director that he

felt he was being targeted and discriminated against for "being a triple minority, Black, Gay, and being in the bargaining unit while also reiterating that he was also Asthmatic." *Id.*

In April 2020 during the beginning of the COVID-19 pandemic, Plaintiff was partially furloughed. *Id.* While some employees were given only a 25% furlough, Plaintiff and his team were allegedly only on the schedule for slightly less than 50% of their normal hours. *Id.* Even though Plaintiff was informed he could apply for partial unemployment to make up for lost wages, his unemployment claim failed because he made too much to qualify. *Id.* Plaintiff alleges that the management team—comprised of Ms. Dubberly, Ms. O'Connor, Mr. Driscoll, and Secretary Treasurer Mr. Arnold—had "incorrectly calculated the unemployment" for he and other members of the accountant team. *Id.* Once Plaintiff presented the correction to Human Resources, it was fixed. *Id.*

In June 2020, during the Black Lives Matter protests, BAC issued various public statements, but did not release any internal statements to employees. *Id.* at 10. Plaintiff and other "Black employees felt less than." *Id.*

In November 2020, Plaintiff applied for an Accounting Manager position. *Id.* He met all but one requirement for the position, that being holding a certified public accountant ("CPA") license; his resume was returned back to him and he was told by Human Resources, on the instruction of Ms. Dubberly, that he could not even interview for the position because of lacking a CPA license. *Id.* The position then sat empty for months. *Id.* Plaintiff notes that Ms. Dubberly, a white woman, was promoted to Executive Director of Financial Management Unit without applying or interviewing for the job and without the accolades or degrees that were "historically required" of said position. *Id.* at 11. He also notes that another white employee received a promotion without a CPA license or advanced degree. *Id.*

6

Plaintiff alleges that on March 5, 2021, he emailed the Executive Board complaining about the mistreatment of minority employees and, in particular, regarding not receiving a cost-of-living increase. *Id.* Plaintiff did not receive a response; instead, he alleges that he "experienced routine undue targeted harassment and retaliation." Compl. at 1; *see also* Pl.'s Opp'n at 11.

Later that month on March 23, 2021, Ms. O'Connor and Ms. Dubberly "ambushed Plaintiff, six other Black employees and one white employee with an 'Investigative Meeting'" without Human Resources present. *Id.* at 12. As Plaintiff was sick, he was not in attendance. *Id.* At the meeting, one Black employee was terminated, four Black employees were suspended, one white employee was suspended, and two Black employees' pay was docked. *Id.* Plaintiff says that "Defendant left [him] walking on eggshells [] with extreme anxiety and trauma... until the day he was terminated because of their decision not to inform [him] that they were not going to have an investigatory meeting." *Id.* at 21.

On June 7, 2021, BAC issued a COVID-19 Readiness Plan and held an all-staff meeting, during which they discussed COVID-related policies and first mentioned imposing a vaccine policy for those engaged in work-related travel. *Id.* at 12. BAC's General Counsel allegedly told one of Plaintiff's coworkers that she did not foresee this vaccine requirement being imposed for all employees. *Id.* at 13. On June 16, 2021, BAC held a Vaccine Hesitancy Webinar. *Id.* at 13. Plaintiff alleges that BAC "purposely only invited the employees that engaged in work related travel[,] which represents 75% of BAC's White employees and only 11% of BAC's Black employees." *Id.* The purpose of this meeting was to discuss "insights into the latest trends and developments surrounding the pandemic, address questions, and dispel myths related to the pandemic and vaccination initiatives." *Id.*

On June 17, 2021, BAC emailed employees that they would not have off for Juneteenth, even though it was a federal holiday.  *Id.*

On August 19, 2021, Defendant BAC issued a COVID-19 Vaccination Policy ("Vaccine Policy" or "Policy").  *Id.*  The Vaccine Policy required "all employees… to be "fully vaccinated against COVID 19, and to provide proof of their vaccination status [] by October 4[, 2021]" or otherwise obtain an accommodation.  Def.'s Mot., Ex. 1-1 (copy of Vaccine Policy).  The Policy stated that

> Any employee who has a disability that contraindicates the vaccination, or who objects to being vaccinated on the basis of sincerely held religious beliefs and practices, should use the appropriate attached form to request an accommodation. HRU [Human Resources] will work with the employee to determine if a reasonable accommodation can be provided so long as it does not create an undue hardship for the employer and does not pose a direct threat to the health or safety of others in the workplace. Any such requests should be submitted as soon as possible, and absent extenuating circumstance, no later than September 13.

*Id.*  The Policy stated that "[a]ny employee who has failed to submit proof that he or she is fully vaccinated against COVID 19 by October 4, and who has not timely requested an exemption pursuant to Paragraph 3 above, will be suspended without pay for one week."  *Id.*  It continued that "[a]ny employee who has failed to submit proof that he or she is fully vaccinated immediately following such one-week suspension will be terminated."  *Id.*

On September 14, 2021, the Human Resources Manager sent reminder emails about the October 4 deadline; however, they had not previously sent reminders about the September 13 accommodation request deadline.  Pl.'s Opp'n at 14.  Plaintiff also received a call that day from Ms. Dubberly asking about his vaccination status "under the guise of office scheduling," which made Plaintiff "wary of her motivations."  *Id.*  Plaintiff did not confirm or deny his vaccination status.  *Id.*

Next, on October 1, 2021, after efforts by the bargaining unit, the BAC agreed to extend a grace period for people to become fully vaccinated by October 18, 2021. *Id.* at 14–15. Plaintiff claims that Defendant "intentionally misrepresented" the grace period. *Id.* at 15.

On October 4, 2021, Plaintiff emailed BAC President Timothy Driscoll, General Counsel Bridget O'Connor, and Human Resources on how their "unevenly applied" Vaccine Policy would "cause additional disparate impact/treatment to Black American employees compared to [] white counterparts." Compl. at 1. Plaintiff highlighted "the tight time deadlines, the need for a testing option that would not cost the company anything, the porosity concerns of HR and medical information." Pl.'s Opp'n at 15. Plaintiff also mentioned his pre-existing medical conditions and expressed his desire to help the BAC "end its systemic discriminatory practices by offering support or solutions." *Id.*; *see also* Compl. at 1. Plaintiff did not receive a response to this email. *Id.*

The following day on October 5, 2021, BAC released an emergency resolution. *Id.* at 15–16. Plaintiff alleges that this resolution included lies about vaccine requirements for the building and other misrepresentations. *Id.* at 16.

Plaintiff did not submit proof of vacation by the deadline. He was suspended for a week, according to the Vaccine Policy, and was ultimately terminated from his position on October 12, 2021 via express mail. Compl. at 1; Pl.'s Opp'n at 16. On October 25, 2021, a class action grievance was filed on behalf of all bargaining unit employees "to correct the adverse effects by the unevenly applied" Vaccine Policy. *Id.* at 16–17. The grievance was denied in November 2021. *Id.* at 17. Also in November 2021, Plaintiff received the shipment of his belongings from

his work office without any warning; he was in "shock" to find "the boxes left outside damaged in the rain free for porch pirates to take," contrary to what he saw occur with other white employees. *Id.*

On November 19, 2021, Plaintiff filed an inquiry with the Equal Employment Opportunity Commission ("EEOC"). *Id.* at 18. On April 1, 2022, Plaintiff filed a Charge of Discrimination with the EEOC and on September 26, 2022, the EEOC issued a Notice of Right to Sue letter. Compl. at 1; *see also* Def.'s Mot. at 3.

Plaintiff then filed a Complaint in District of Columbia Superior Court on December 30, 2022, alleging that Defendant violated the District of Columbia Human Rights Act ("DCHRA"), the Americans with Disabilities Act of 1990 ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and "other applicable Civil Rights Acts." Compl. at 2. Plaintiff requests various remedies, including a "full scale systemic investigation of Defendant's discriminatory policies," compensatory damages, cost and fees, punitive damages, backpay of lost benefits, compensation for emotional distress and trauma, diversity and management training for Defendant's management, punishment for BAC employees who are responsible for "the forementioned abuses," the making available of resources to BAC employees regarding civil rights in the workplace, a "full structural analysis of the organization to identify areas of managerial deficiency that enabled discriminatory practices," and "[f]or effective mechanisms to be put in place to end the legacy of decades of systemic racism." *Id.* at 2. Plaintiff demands $7.5 million in damages. *Id.* at 3.

On February 3, 2023, Defendant removed the complaint to this Court pursuant to 28 U.S.C. § 1441(a). *See* Notice of Removal ¶ 3. Defendant then filed a [8] Motion to Dismiss on February 21, 2023 pursuant to Federal Rule of Civil Procedure 12(b)(6). *See generally* ECF No.

8.  On March 6, 2023, prior to the deadline to respond to Defendant's Motion to Dismiss, Plaintiff filed a Motion to Remand.  The Court then vacated the briefing schedule and held in abeyance the Motion to Dismiss pending the resolution of Plaintiff's Motion to Remand.  *See* Minute Order, Mar. 8, 2023.  The Court denied the Motion to Remand on July 18, 2023.  *See* Mem. Op., ECF No. 15.  With the [8] Motion to Dismiss now fully briefed, the Court now turns to its resolution.

## II. LEGAL STANDARD

Pursuant to Rule 12(b)(6), a party may move to dismiss a complaint on grounds that it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A complaint is not sufficient if it "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "In evaluating a motion to dismiss, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Nat'l Postal Prof'l Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 27 (D.D.C. 2006) (PLF).

When considering a Rule 12(b)(6) motion, courts may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint" or "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (internal quotation

marks omitted) (quoting *Gustave–Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (RBW); *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009)).  The court may also consider documents in the public record of which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

### III. DISCUSSION

To begin, the Court addresses the scope of Plaintiff's pleadings as a *pro se* litigant.  Then, the Court shall move on to considering the merits of Defendant's Motion to Dismiss—but first, the Court notes that Plaintiff's pleadings are unclear as to his exact claims.  In their Motion to Dismiss, Defendant classifies Plaintiff's claims as falling into three categories: (1) retaliation under the ADA, Title VII, and DCHRA; (2) disability discrimination under the ADA and DCHRA; and (3) discrimination due to race, color, or sexual orientation in violation of Title VII and the DCHRA.  *See* Def.'s Mot. at 5–9 (headers and analysis distinguishing categories of claims).  In his opposition, Plaintiff does not dispute this categorization, but does raise new facts and arguments.  Defendants, in reply, state that "Plaintiff's Opposition raises a new claim [for] hostile work environment based on race."  Def.'s Reply at 11.[3]  The Court will consider Plaintiff to have raised these four categories of claims; to the extent that Plaintiff had intended to raise other claims, they are foreclosed.  The Court finds that Plaintiff fails to state any claims for which relief can be granted and, therefore, the Court will **GRANT** Defendant's Motion to Dismiss in its entirety.

### A.  Scope of Plaintiff's Pleadings

Typically, when deciding a motion to dismiss, "a court does not consider matters outside

---

[3] The Court does note that Plaintiff's original Complaint does in fact use the language "hostile work environment," so Defendant's statement that it is a new claim is misleading.  *See* Compl. at 1.

the pleadings." *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C.

2019); *see also* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters

outside the pleadings are presented to and not excluded by the court, the motion must be treated

as one for summary judgment under Rule 56.").  However, complaints filed by *pro se* litigants

are held to less stringent standards than those applied to formal pleadings drafted by lawyers, *see*

*Haines v. Kerner*, 404 U.S. 519, 520 (1972), and the Court of Appeals has ruled that a court must

consider a *pro se* litigant's complaint "'in light of' all filings," *Brown v. Whole Foods Mkt. Grp.,*

*Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) (quoting *Richardson v. U.S.*, 193 F.3d 545, 548 (D.C.

Cir. 1999)); *see also Greenhill v. Spellings*, 482 F.3d 569, 572 (D.C. Cir. 2007) (stating that the

Court of Appeals has "permitted courts to consider supplemental material filed by a pro se

litigant in order to clarify the precise claims being urged").  This means that "courts may

consider documents filed after a complaint when evaluating a motion to dismiss." *Weise v. Fed.*

*Bur. of Investigation*, No. 20-cv-2572 (JMC), 2022 WL 13947753, at *2 (D.D.C. Oct. 24, 2022).

Such documents may include those in response to a motion to dismiss.  *See Brown*, 789 F.3d at

152; *Fillmore v. AT&T Mobility Servs. LLC*, 140 F. Supp. 3d 1, 2 (D.D.C. 2015) (JEB) ("the

Court, as it must in a case brought by a pro se plaintiff, considers the facts as alleged in both the

Complaint and Plaintiff's Opposition to Defendant's Motion to Dismiss.").

 The Court will therefore consider Plaintiff's opposition brief as part of Plaintiff's

pleadings for the purpose of resolving Defendant's Motion to Dismiss.

### B. Retaliation

 Plaintiff claims that he experienced retaliation from higher-ups at BAC, *see* Compl. at 1;

his pleadings seem to articulate two time periods of allegedly retaliatory action.

 First, Plaintiff alleges that after complaining to Ms. Penoso about pay disparity between

accountants and financial analysts in 2007, "she started… retaliating [against]… the Plaintiff because she didn't like that he stood up to advocate to end the unjustified pay disparity."  Pl.'s Opp'n at 4–5.  He states that the "behavior toned down" and "direct harassment eventually ceased around 2013."  *Id.*

Second, Plaintiff alleges that after emailing the BAC Executive Board about the mistreatment of minority employees on March 5, 2021, "they never responded[,] but a few weeks later, I experienced routine undue targeted harassment and retaliation."  Compl. at 1.  On March 23, 2021, Ms. O'Connor and Ms. Dubberly called an investigative meeting, during which numerous Black employees were terminated, suspended, or had their pay docked.  Pl.'s Opp'n at 12.  Plaintiff, however, was not present at that meeting, as he was home sick.  *Id.*  Plaintiff argues that "for the Defendant to conveniently ambush Black people including the Plaintiff with investigatory meetings on the anniversary date of a union contract… show correlation and intent of such retaliatory harassment."  *Id.* at 21.  Plaintiff continues that because of "the fact that the Defendant left Plaintiff walking on eggshells [] with extreme anxiety and trauma… until the day he was terminated because of their decision not to inform me that they were not going to have an investigatory meeting with me, this retaliatory act actually extends until October 12, 2021," the date of his termination.  *Id.*

The Court finds that Plaintiff's claims of retaliation fail because some are time-barred under Title VII, the ADA, and the DCHRA; those that are not time-barred fail to satisfy the required element of a materially adverse action.

Before suing under either the ADA or Title VII, an aggrieved party must exhaust their administrative remedies by filing a charge of discrimination with the EEOC within 180 days of the alleged discriminatory incident or, if they had instituted proceedings with a state or local

agency, within 300 days.  42 U.S.C. § 2000e-5(e)(1) (Title VII); 42 U.S.C. § 12117(a) (remedies and procedures under § 2000e-5 also apply to ADA); *see also Washington v. Wash. Metro. Area Transit Auth.*, 160 F.3d 750, 752 (D.C. Cir. 1998); *Marshall v. Fed. Exp. Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997).  A lawsuit following a charge is limited "to claims that are like or reasonably related to the allegations of the charge and growing out of such allegations."  *Park v. Howard University*, 71 F.3d 904, 907 (D.C. Cir. 1995).  "Because untimely exhaustion of administrative remedies is an affirmative defense, the defendant bears the responsibility of pleading and proving it."  *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) (citing *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985)); *see also Irwin v. Dep't of Vets. Affs.*, 498 U.S. 89, 95–96 (1990).

Plaintiff has not alleged that he instituted any proceedings with the D.C. Office of Human Rights or any other state or local agency, *see* Def.'s Mot. at 5, and therefore the 180-day deadline applies.  Plaintiff did not file an EEOC charge until April 1, 2022, Compl. at 1, which would bar any claims predicated on events that occurred before October 3, 2021.[4]  Submitting an inquiry to the EEOC does not satisfy the exhaustion requirement, *Gulley v. District of Columbia*, 474 F. Supp. 3d 154, 165 (D.D.C. 2020) (TNM), and accordingly Plaintiff's EEOC inquiry filed on November 19, 2021 does not shift this October 3 date back.  Accordingly, anything alleged before October 3, 2021 is time-barred under Title VII and the ADA; this includes both the retaliation Plaintiff allegedly experienced after complaining to Ms. Penoso in 2007, as well as the March 23, 2021 investigative meeting.

These same claims are also time-barred under the D.C. Human Rights Act.  The DCHRA

---

[4] Defendant notes that "even giving Plaintiff the benefit of the longer 300-day limitations Period[,]… Plaintiff's EEOC charge… reaches back, at most, to claims that arose on or after June 5, 2021."  Def.'s Mot. at 5.

has a one-year statute of limitations.  *See* D.C. Code § 2-1403.16(a).  The statute of limitations was tolled while Plaintiff's EEOC charge was pending between April 1, 2022 and September 26, 2022 (totaling 178 days).  *See id.*  As Plaintiff filed this lawsuit on December 30, 2022, any claims that arose before July 5, 2021 would be time-barred under the DCHRA.  Accordingly, the retaliation Plaintiff allegedly experienced in 2007 and on March 23, 2021 are time-barred under this state statute as well.

Plaintiff does, however, argue that BAC's retaliatory acts "extend[ed] until October 12, 2021" because BAC "left [him] walking on eggshells up with extreme anxiety and trauma" when they "did not inform [him] that they were not going to have an investigatory meeting."  Pl.'s Opp'n at 21.  The Court will consider Plaintiff to be articulating that the Defendant took a retaliatory action in failing to inform him about whether a meeting would be held or otherwise update him on the status of his employment.  Even giving Plaintiff this benefit, his claim fails.

To assert a claim of retaliation under Title VII, the ADA, or the DCHRA, Plaintiff must show that "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two."  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009); *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (analyzing Title VII and DCHRA retaliation claims together); *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (stating that Title VII and ADA retaliation claims are analyzed under the same framework).  The "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  An action is "adverse" if the employer's actions are likely to have "'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006) (quoting *Rochon v. Gonzales*, 438

F.3d 1211, 1219 (D.C. Cir. 2006)).  Retaliation claims are "limited to those where an employer causes 'material adversity,' not 'trivial harms.'"  *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) (quoting *Burlington*, 548 U.S. at 68).

The realm of trivial harms—as opposed to materially adverse actions—has been held to include lack of clarification regarding work assignments, *see Allen v. Napolitano*, 774 F. Supp. 2d 186, 200 (D.D.C. 2011) (JDB); failure to respond to an employee's requests in a timely manner, *id.*; slight alteration of job responsibilities, *see Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002); failure to be nominated for an award, *see Bridgeforth v. Jewell*, 721 F.3d 661, 663–65 (D.C. Cir. 2013); sporadic verbal altercations or disagreements, *see Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008); "oral reprimand," "public embarrassment," "micromanage[ment]," and other "purely subjective injuries or disagreements about management policies and decisions," *see Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 70–71 (D.D.C. 2012) (ABJ).  In one particular case, a plaintiff claimed she was excluded from a job-related meeting in retaliation for filing an EEO complaint.  *Hayslett v. Perry*, 332 F. Supp. 2d 93, 105 (D.D.C. 2004) (ESH).  The court found that because the plaintiff had failed to identify a specific meeting nor demonstrated how her alleged exclusion from the unspecified meeting had an adverse impact on her employment terms or conditions or caused any objectively tangible harm, it was not a materially adverse action to satisfy the legal standard for retaliation and, therefore, the court dismissed plaintiff's claim.  *Id.*  The case at hand is similar.  Plaintiff has alleged that BAC's failure to let him know whether or not an investigatory meeting would be held caused him anxiety.  There was no specified meeting that Plaintiff has identified nor that he was promised, and BAC's failure to inform him about a meeting or otherwise update him on the status of his employment, although it may have caused him severe stress, cannot be said to be more than a

harm, like those above, considered trivial.

Accordingly, the Court finds that Plaintiff's allegations for retaliation that occurred after October 3, 2021 fail to satisfy the element of materially adverse action.  The Court need not address the other elements required and, instead, will **GRANT** Defendant's motion to dismiss Plaintiff's claims of retaliation.

### C. Discrimination Based on Disability

Plaintiff also alleges that he experienced discrimination on the basis of disability.  The Court finds that Plaintiff's disability discrimination claims under the ADA and DCHRA fail because Plaintiff has not pled that he has a disability within the meaning of the statutes.

"To establish a prima facie case of unlawful discrimination based on a failure to reasonably accommodate under the ADA, a plaintiff must show, by a preponderance of the evidence, that: (1) he is a qualified individual with a disability within the meaning of the ADA; (2) the employer had notice of his disability; (3) there was some reasonable accommodation denied to him; and (4) such accommodation would have enabled him to perform the essential functions of his job." *Saunders v. Galliher & Huguely Assocs., Inc.*, 741 F. Supp. 2d 245, 248 (D.D.C. 2010). Courts analyze DCHRA reasonable accommodation claims under the same standards as the ADA. *See McFadden v. Ballard Spahr Andrews & Ingersoll*, LLP, 611 F.3d 1, 5 (D.C. Cir. 2010).

As for the first element, Defendant argues Plaintiff is not a qualified individual with a disability.  They state that "[n]owhere in his Complaint does Plaintiff allege that he has a disability, much less what that disability is and how it limits him in a major life function."  Def.'s Mot. at 7.

To bring a claim for disability discrimination under the ADA or the DCHRA, a plaintiff

must demonstrate that they are disabled within the meaning of the statute.   *See Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (ADA); *Chang v. Inst. v. Public–Private P'ships, Inc.*, 846 A.2d 318, 324 (D.C. 2004) (DCHRA); *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583 (D.C. 2001) (the ADA's definition of "disability" is "persuasive" in construing the DCHRA).  An individual must plead facts sufficient to show: (1) that they have a physical or mental impairment (2) that substantially limits (3) a major life activity, *Haynes v. Williams*, 392 F.3d 478, 481–82 (D.C. Cir. 2004), or otherwise that they have a record of such an impairment or are regarding as having such an impairment, *see* 42 U.S.C. § 12102(1).

        Plaintiff fails to allege that he is disabled within the meaning of the ADA or DCHRA. Plaintiff makes one reference to being asthmatic.  *See* Pl.'s Opp'n at 9 (alleging that during the early 2020 grievance process regarding his write-up for accessing the building outside of business hours, he informed the Human Resources Director that he felt he was being discriminated against for "being a triple minority, Black, Gay, and being in the bargaining unit while also reiterating that he was also Asthmatic").  Plaintiff's other reference to disability is in his October 4, 2021 emails to various BAC supervisors, in which he "informed them of his Vaccination status and him having pre-existing medical conditions that he had concerns with having an adverse reaction."  *Id.* at 15; *see also id.* at 22 (quoting two emails on October 4, 2021 in which he refers to "preexisting medical conditions" without any further detail).

        Other than these passing remarks, Plaintiff offers no facts regarding his disability. Accordingly, he fails to plead facts showing that his asthma—or any other disability he may have—substantially limits a major life activity. *Adams v. Rice*, 531 F.3d 936, 943 (D.C. Cir. 2008) (all three disability definitions under 42 U.S.C. § 12102(1) require a showing that the impairment substantially limits a major life activity).  Courts have dismissed disability claims

where plaintiffs provide far more detail about their purported disability.  *See, e.g.*, *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 200 (D.D.C. 2008) (PLF) (dismissing plaintiff's complaint after determining that "[a]t most, he [had] offered evidence that his impairments affected his ability to do the job he held "); *Dave v. Lanier*, 681 F. Supp. 2d 68, 75–76 (D.D.C. 2010) (RMU) (dismissing claim of plaintiff, who asserted that a shoulder injury and asthma made him unable to perform certain physical tasks); *Jones v. Quintana*, 658 F. Supp. 2d 183, 190, 201 (D.D.C. 2009) (CKK) (dismissing disability discrimination claim where plaintiff pled that she visited multiple health care providers, was diagnosed with anxiety, and had medication for job-related anxiety) *Redmon v. U.S. Capitol Police*, 80 F. Supp. 3d 79, 88 (D.D.C. 2015) (TSC) (finding that Plaintiff did not adequately plead a disability under the ADA, even where she included information that during a sarcoidosis flare-up, the pain in her legs makes it difficult for her to commute to work).

As Plaintiff has failed to plead the facts sufficient to show that he is disabled within the meaning of the ADA or DCHRA, the Court finds that his claim must fail, and need not discuss the other elements of a disability discrimination claim.  The Court will **GRANT** Defendant's motion to dismiss Plaintiff's claims of disability discrimination.

### D.  Discrimination Based on Race, Color, or Sexual Orientation

Next, Plaintiff argues that he was discriminated against due to race, color, or sexual orientation in violation of Title VII and the DCHRA when BAC terminated his employment.

In order to establish a prima facie case of racial discrimination under Title VII or the DCHRA, a plaintiff must show that "(1) [s]he is a member of a protected class, (2) [s]he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that [her] employer took the action because of [her]

membership in the protected class)." *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002);

*Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263, 286 (D.D.C. 2011) (JDB) (analysis same under

Title VII and DCHRA).

No one disputes that Plaintiff is a member of a protected class, being that he is Black and

gay.  *See Bostock v. Clayton Cty.*, 590 U.S. --- (2020) (holding that sexual orientation is a

protected class).  And no one disputes that Plaintiff suffered an adverse employment action, as he

was terminated from his position on October 12, 2021.  *See Douglas v. Donovan*, 559 F.3d 549,

552 (D.C. Cir. 2009) (an adverse employment action is "a significant change in employment

status, such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits.").  However, Plaintiff fails

to plead facts sufficient to show that either his race or his sexual orientation were the reason for

his termination.

Plaintiff was terminated following his failure to adhere to BAC's Vaccine Policy.  The

Policy required proof of vaccination by October 4, 2021.  *See* Def.'s Mot. Ex. 1-1 at 3.  Plaintiff

did not provide such proof.  As a result, he was suspended for one week on October 5, 2021; one

week later he was terminated from his position, Compl. at 1; Pl.'s Opp'n at 16, in accordance

with the express language of BAC's Policy, Def.'s Mot. Ex. 1-1 at 3 ("Any employee who has

failed to submit proof that he or she is fully vaccinated against COVID 19 by October 4, and

who has not timely requested an exemption pursuant to Paragraph 3 above, will be suspended

without pay for one week.… Any employee who has failed to submit proof that he or she is fully

vaccinated immediately following such one-week suspension will be terminated.").

Plaintiff has failed to plead facts that plausibly allege that the Vaccine Policy was

discriminatory on its face.  The Policy applied evenly to "all employees."  *See* Def.'s Mot., Ex. 1-

1 at 3.

Plaintiff has also failed to plead facts that plausibly allege that the Vaccine Policy was applied in a discriminatory manner.  Plaintiff references that "because some individuals or demographic groups may face barriers to receiving a COVID-19 vaccination, some employees may be more likely to be negatively impacted by a vaccination requirement."  Pl.'s Opp'n at 26. However, these national patterns or trends are not pertinent.  He also claims that Black employees were given "nearly 2.5 months of less time to make an informed healthcare decision" about the vaccine.  *Id.* at 27.  Presumably Plaintiff is referring to the June 7, 2021 all-staff meeting, during which BAC first mentioned imposing a vaccine policy for employees engaged in work-related travel, most of whom were white, and the June 16, 2021 meeting on vaccine hesitancy for said employees.  *See id.* at 12.  However, the fact that employees who engaged in work-related travel were aware that they would be subject to a vaccine mandate before all other employees were in fact subject to such a mandate does not make the Policy discriminatory.  As Defendant states, Plaintiff "does not claim that non-Black or heterosexual employees who failed to submit proof of vaccination or an accommodation request were allowed to continue working at BAC after October 4, 2021," "[n]or does he allege that accommodation requests by non-Black or heterosexual employees were granted, and that requests by Black or LGBTQ employees were denied."  Def.'s Mot. at 10.  Finally, Plaintiff has also failed to plead facts that plausibly allege that he was terminated for reasons other than his violation of the Policy.

Therefore, where Plaintiff has failed to plead facts sufficient to satisfy the elements of a Title VII or DCHRA discrimination claim, the Court will **GRANT** Defendant's motion to dismiss Plaintiff's claims of discrimination.

### E.  Hostile Work Environment

22

Plaintiff also raises a claim for hostile work environment based on race.  *See* Compl. at 1; *see also* Def.'s Reply at 11.  Plaintiff alleges the following facts that could be construed as giving rise to his hostile workplace claim:[5]  First, that in 2007, BAC restricted Plaintiff's ability to work overtime hours after complaining about pay disparities between non-white accountants and white financial analysts.  Pl.'s Opp'n at 4; that in 2017, he was not given a promotion after negotiating a successful contract for the bargaining unit while white members of that team were, *id.* at 5; that in fall 2017, the BAC initiated a Building Policy that disparately impacted Black employees, *id.*; that in 2018, when he raised his hand at an Anti-Discrimination/Anti-Harassment Training session, the leader sighed and responded "of course" before failing to respond to his question, *id.* at 6; that in February 2018, BAC did not address his concerns about pay disparity and other disparate treatment happening to Black employees in areas of building access, transportation, leave, and life insurance, *id.* at 6–7; that in 2019, BAC continued to pay financial analysts, who were either white or Asian during Plaintiff's employment with BAC, more than accountants, who were either Black or Asian during Plaintiff's employment with BAC, *id.* at 6; that in late 2019, BAC did not respond to and misrepresented the BAC Employee's Parking Petition, which was aimed to create more parking options for employees, many of which were non-white, *id.* at 8–9; that in early 2020, BAC wrote up Plaintiff for violating a policy by accessing the building outside of business hours, *id.* at 9; that in April 2020, Plaintiff was furloughed during COVID and the management team incorrectly calculated his unemployment, which was later corrected *id.*; that in June 2020, BAC failed to issue an internal statement to employees during the Black Lives matter protests, *id.* at 10; that in November 2020, he was told he could not interview for an

---

[5] Plaintiff's pleadings did not link the stated facts to his legal theories, so the Court is tasked with endeavoring to do so for him.

Accounting Manager position because he did not have a CPA license, although other employees at BAC had been allowed to interview for and had been given positions without certain licenses, *id.* at 10–11; that in March 2021, the Executive Board did not respond to his email about the mistreatment of minority employees, including not receiving a cost-of-living increase, *id.* at 11; that later in March 2021, BAC "ambushed" Plaintiff, six other Black employees, and one white employee with an investigative meeting, during which all employees in attendance suffered either termination, suspension, or pay cuts, *id.* at 11–12; that only employees who engaged in work-related travel, most of whom were white, were invited to the vaccine hesitancy webinar in June 2021, *id.* at 13; and that BAC did not give employees off for Juneteenth, *id.*

The Court finds that Plaintiff has failed to state a claim for hostile work environment because he complains of discrete acts that are not plausibly connected, many are time-barred, and they are not sufficiently pervasive or severe to plausibly satisfy the standard.

To make out a prima facie case for a hostile work environment, a plaintiff must show that (1) they are a member of a protected class; (2) they were subjected to unwelcome harassment; (3) the harassment was based on their status within the protected class; (4) the harassment unreasonably interfered with their work performance and created a hostile work environment; and (5) the employer knew or should have known about the condition but failed to act. *Clipper v. Billington*, 414 F. Supp. 2d 16, 24 (D.D.C. 2006) (RCL).  In other words, a plaintiff must show that the employer engaged in discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  *Achagzai v. Broad. Bd. of Govs.*, 170 F. Supp. 3d 164, 183 (D.D.C. 2016) (RDM).  To ascertain whether a work environment is sufficiently hostile to be actionable under Title VII, the Court must consider all the circumstances: the frequency and severity of the

24

conduct, whether the conduct is physically threatening, and if the conduct reasonably interferes with job performance.  *Faragher v. Boca Raton*, 524 U.S. 775, 787–88 (1998).  Crucially, a plaintiff must also "establish that the allegedly harassing conduct… was based on a protected characteristic," or that there is "some linkage between the hostile behavior and the plaintiff's membership in a protected class."  *Byrd v. Vilsack*, 931 F. Supp. 2d 27, 45 (D.D.C. 2013) (RLW).

Importantly, a hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice."  42 U.S.C. § 2000e–5(e)(1). Therefore, a plaintiff must demonstrate that the alleged events leading to the hostile work environment were connected, since "discrete acts constituting discrimination or retaliation claims… are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult."  *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) (JDB) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16 (2002)); *see also Moore v. Castro*, 192 F. Supp. 3d 18, 46 (D.D.C. 2016) (JDB) ("Cobbling together a number of distinct, disparate acts will not create a hostile work environment, because discrete acts constituting discrimination or retaliation claims are different in kind from a hostile work environment claim.") (citation omitted); *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) ("Workplace conduct is not measured in isolation.").  It is well-established that "this jurisdiction frowns on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation"—or discrimination—"into a broader hostile work environment claim."  *Baloch v. Norton*, 517 F. Supp. 2d 345, 364 (D.D.C. 2007) (RMU), *aff'd sub nom. Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008).  However, there is no bright line rule for determining when a variety of component-acts may be considered collectively; instead, "courts must exercise their judgment carefully and on a case-by-case basis."  *Baloch*, 517 F.Supp.2d at 363.  In exercising

25

that judgment, courts must consider the extent to which the alleged actions are related in time and type, for example, if they were "involving the same type of employment actions, occurring relatively frequently, and being perpetrated by the same managers." *Whorton v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 334, 350 (D.D.C. 2013) (RC) (cleaned up).

Here, Plaintiff has compiled a list of employment actions, the bulk of which are alleged discrete discriminatory acts, that he ostensibly attempts to bring under the umbrella of a hostile work environment claim.  The majority of these acts are spread out over the course of four years, from 2017 to 2021; the acts involve conduct ranging from BAC's failure to respond to his complaints about the workplace, to imposing a Building Policy, to incorrectly calculating his unemployment when furloughed during COVID-19, which was corrected; to BAC's failure to issue an internal statement during the Black Lives Matter protests; and the acts implicate a broad set of actors, including Ms. Penoso, Ms. Dubberly, Ms. Sohn, Mr. Driscoll, and Mr. Arnold. Altogether, Plaintiff's claims do not coalesce into a recognizable pattern of connected incidents. *Cf. Outlaw v. Johnson*, 49 F. Supp. 3d 88, 91 (D.D.C. 2014) (EGS) (dismissing plaintiff's claim for similar reasons); *Mason v. Geithner*, 811 F. Supp. 2d 128, 178–79 (D.D.C. 2011) (CKK) (conducting similar analysis of a plaintiff's "'kitchen sink approach' to crafting a hostile work environment claim," although at summary judgment stage).

Additionally, all of these acts are time-barred—from Plaintiff's levying of complaints about pay disparities in 2007 and 2019 and BAC's treatment of him thereafter, to his denial of the opportunity to interview for a managerial position in November 2020, to BAC's decision to not give their employees off for Juneteenth in 2021.  Case law is clear that a "plaintiff cannot cure his failure to timely exhaust his complaints about these incidents by sweeping them under the rubric of a hostile work environment claim." *Dudley*, 924 F. Supp. 2d at 164 (internal

26

citations and quotation marks omitted).  Acts that fall outside the limitations period are not time-barred "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period," *Morgan*, 536 U.S. at 117.  For the reasons explained above, Plaintiff has failed to show that many, if any, of these incidents were adequately linked.  *Cf. Burkes v. Holder*, 953 F. Supp. 2d 167, 178 (D.D.C. 2013) (EGS) (finding that plaintiff failed to do the same when faced with a motion to dismiss).  Furthermore, Plaintiff has not alleged that at least one act falls within the proper time period.  As discussed earlier, any claims predicated on events that occurred before October 3, 2021[6] would be time-barred; all incidents that the Court could presume to be part of Plaintiff's hostile work environment claim occurred before that date and would therefore be barred.

Finally, when the Court looks at the totality of the circumstances, Plaintiff has not plausibly alleged that he was subject to a workplace environment that was objectively and subjectively hostile, permeated with discriminatory intimidation, ridicule, and insult.  *See Baloch*, 550 F.3d at 1201; *Johnson v. Shinseki*, 811 F. Supp. 2d 336, 345 (D.D.C. 2011) (JDB).  For example, Plaintiff's allegation that a training leader sighed and responded "of course" when he asked a question is insufficient to give rise to a plausible inference of a hostile workplace environment, *see Staton v. Children's Nat'l Med. Ctr.,* No. 20-cv-3328 (DLF), 2022 WL 4446396, at *6 (D.D.C. Sept. 23, 2022) (manager rolling her eyes in response to a plaintiff's statement not abusive, threatening, or humiliating conduct); *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) ("simple teasing, offhand comments, and isolated incidents (unless

---

[6] This deadline is based on Plaintiff's EEOC charge filed on April 1, 2022, as was discussed above.  *See* Section III.B *supra*.  The Court is assuming, for the purposes of this analysis, that Plaintiff's hostile work environment claim and the facts giving rise to such a claim would be considered within the scope of his EEOC charge.

extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."). So, too, is a restriction in his overtime hours, *see Swann v. Office of Architect of Capitol*, 73 F. Supp. 3d 20, 32 (D.D.C. 2014) (CRC); being excluded from meetings, *see Singh v. U.S. House of Reps.*, 300 F. Supp. 2d 48, 56–57 (D.D.C. 2004) (RMC), or not being promoted after negotiating a successful contract for his bargaining unit, *see Laughlin v. Holder*, 923 F. Supp. 2d 204, 221 (D.D.C. 2013) (JDB). And even taken together, these isolated incidents are not fairly characterized as pervasive or particularly severe. *Cf. id.* at 220–221 (dismissing plaintiff's hostile work environment claim, finding that plaintiff did not allege conduct that was sufficiently severe or pervasive); *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 7–10 (D.D.C. 2019) (TJK) (same).

The Court finds that Plaintiff has failed to plead facts sufficient to satisfy the elements of a hostile workplace environment claim. Accordingly, the Court will **GRANT** Defendant's motion to dismiss Plaintiff's claim.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's [8] Motion to Dismiss in its entirety. An appropriate order accompanies this Memorandum Opinion.

                                          /s/
                                     COLLEEN KOLLAR-KOTELLY
                                     United States District Judge